The **TITLE GUARANTEE COMPANY**
v.
The **UNITED STATES.**
No. 120–69.

United States Court of Claims.
Oct. 16, 1970.

Lydia E. Kess, New York City, for plaintiff. Wallace S. Jones, New York City, attorney of record.

Michael H. Singer, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

SKELTON, Judge:

This is a suit for refund of income taxes in the sum of $42,218.01 and interest paid thereon in the sum of $12,672.80, all in the total sum of $54,890.81, plus any additional interest and amounts as may be legally refundable for the calendar years 1960 through 1964. The facts giving rise to this controversy are fully set forth in the following portions of the stipulation of facts agreed to by the parties and filed herein:

1. The plaintiff, The Title Guarantee Company, is a New York corporation, incorporated by Chapter 382 of the laws of 1882, as amended by Chapter 387 of the laws of 1883, and existing under such laws of the State of New York, with its principal place of business located at 120 Broadway, New York, New York 10005.

2. Effective June 1, 1945 and during the years 1960 through 1964, Section 434 of the Insurance Law of the State of New York, McKinney's Consol.Laws, c. 28, provided, insofar as it is relevant herein, that:

"1. Every title insurance corporation organized and doing an insurance business under this article shall establish, segregate and maintain a reinsurance reserve during the period and for the uses and purposes hereinafter provided which shall at all times and for all purposes be deemed and shall constitute unearned portions of the original premiums and shall be charged as a reserve liability of such corporation in determining its financial condition; such reserve shall be cumulative and shall be established and shall consist of the following:

\* \* \* \* \* \*

b. beginning June first, nineteen hundred forty-five (1) one dollar fifty cents for each risk assumed under a binder or policy of insurance or any certificate or agreement issued under either of them, plus one-eightieth of one percent of the face amount of insurance effected thereby; and (2) three percent of the gross fees and premiums received by it for guaranteed certificates of title, guaranteed searches and guaranteed abstracts of title not included in (1) of this paragraph.

c. after June first, nineteen hundred fifty-three for corporations heretofore organized, and after the expiration of one hundred eighty months from the date of beginning business for any corporation hereafter organized, that portion of the reinsurance reserve established more than one hundred eighty months prior shall be released and shall no longer constitute part of the reinsurance reserve and may be used for any corporate purpose.

\* \* \* \* \* \*

4. The reinsurance reserve required by subsection one of this section shall be set apart and maintained by such corporation in a segregated reserve fund, as follows:

\* \* \* \* \* \*

5. The funds constituting the reinsurance reserve required by subsection one of this section shall be held in cash or invested only in the classes of securities or types of investments specified in paragraphs (a) and (b) of section seventy-nine and subsection twelve of section eighty-one.

\* \* \* \* \* \*

7. The said reinsurance reserve fund required to be established, segregated and maintained, pursuant to subsection four of this section shall constitute a separate and distinct trust fund

for the security of holders of policies, guaranteed certificates of title, guaranteed searchers and guaranteed abstracts of title of the corporation as hereinafter provided.

8. In the event the superintendent, pursuant to the provisions of article sixteen of this chapter, obtains an order for the rehabilitation or liquidation of a title insurance corporation, he shall have the power, (a) to pay out of such reinsurance reserve fund subject to the approval of the court, the claims for losses sustained by the holders of policies, guaranteed certificates of title, guaranteed searches and guaranteed abstracts of title of such corporation pending at the time of the making of such order or arising subsequently thereto and up to the time reinsurance is effected, and (b) to enter into a contract with one or more solvent corporations authorized to transact the business of title insurance, subject to the approval of the court, for the reinsurance of the obligations under such outstanding title policies, guaranteed certificates of title, guaranteed searches and guaranteed abstracts of title of such corporation in rehabilitation or liquidation in accordance with their terms, covenants and conditions, and (c) to pay the cost of reinsurance out of said reinsurance reserve fund of such corporation.

\* \* \* \* \* \*

9. In the event the superintendent shall be unable to effect a contract for reinsurance as provided in subsection eight of this section, for the reinsurance of the obligations under outstanding title policies, guaranteed certificates of title, guaranteed searches and guaranteed abstracts of title of a title corporation in rehabilitation or liquidation, the reinsurance reserve fund of such corporation shall constitute a separate and distinct trust fund for the payment therefrom by the superintendent, on the approval of the court,

in the following order of preference, (1) of all expenses of proceedings incurred under this subsection, (2) of all allowed claims for losses sustained by the holders of policies, guaranteed certificates of title, guaranteed searches and guaranteed abstracts of title of such corporation which are unpaid or pending at the time fixed by the court for the filing of claims and (3) of all allowed claims for losses which shall be asserted at any time within twenty years from the date of the entry of such order of rehabilitation or liquidation and which shall be paid in the order of the date of their allowance by the court. Any balance in the reinsurance reserve fund of a title corporation after payment of allowed claims asserted within twenty years from the date of the entry of the order of rehabilitation or liquidation shall be transferred to the general assets of such corporation."

\* \* \* \* \* \*

5.[1] Plaintiff maintains a Statutory Reinsurance Reserve as a trust fund for policy holders in accordance with the requirements of the Insurance Law of New York (the "Insurance Law"), and makes required additions monthly to said reserve on account of policies and guaranteed searches issued during each month. Plaintiff does not withdraw any amounts from said Statutory Reinsurance Reserve until such amounts are released upon the expiration of the one hundred eighty month period prescribed in Section 434 of the Insurance Law.

6. In the normal course of its business, plaintiff frequently issues individual policies to its insureds in amounts in excess of $5,500,000, and, as a matter of policy and prudence, ordinarily purchases risk iusurance from other title insurers to protect itself against a portion of the possible loss in excess of the first $5,500,000 (approximately 50% of its net worth) on any single policy issued to its insured. Such risk insurance does

---

1. Paragraphs 3 and 4 of the Stipulation of Facts are omitted, as they are not necessary for this opinion.

not in any way diminish or extinguish, in whole or in part, the plaintiff's policy liability to its insured. The terms and cost of such risk insurance purchased by the plaintiff are subject to negotiation between the plaintiff and the company or companies from which such insurance is purchased, and are defined in a contract known as a "facultative treaty agreement", with the premium cost to the plaintiff depending in large measure upon the provisions of the contract with respect to calculation of the portion of losses in excess of $5,500,000 for which the plaintiff will be insured. The premiums paid by the plaintiff for such insurance bear no relationship to the premiums received by it from its own insured.

Attached hereto as Exhibits 1 and 2 are a title insurance policy issued by plaintiff and related facultative treaty agreement which are representative of the respective forms of contract. In respect of policy 4090889, in the amount of $8,000,000, the plaintiff received a premium of $16,177 which was included in income, less $1,001.50 which was added to the Statutory Reinsurance Reserve and will be included in income upon release after 180 months. The plaintiff paid $1,950 for the $3,000,000 risk insurance purchased from the companies listed in the Agreement, and deducted that amount as an ordinary and necessary business expense.

7. Plaintiff has deducted the cost of risk insurance as an ordinary and necessary business expense. For each of the calendar years 1960 through 1964, plaintiff deducted the following amounts representing the cost of such insurance:

| | |
|---|---|
| 1960 | $ 87,555.63 |
| 1961 | 103,978.88 |
| 1962 | 74,621.05 |
| 1963 | 62,441.15 |
| 1964 | 97,102.45 |

8. Plaintiff does not withdraw any amounts from its Statutory Reinsurance Reserve on account of risk insurance purchased from other title insurers, whether purchased from companies authorized to do business in New York or from companies not so authorized.

9. The Internal Revenue Service has recognized that the amounts segregated in the Statutory Reinsurance Reserve shall constitute unearned premiums within the meaning of Section 832 of the Internal Revenue Code.

10. For each of the calendar years 1960 through 1964, plaintiff made the following additions to and withdrawals from its Statutory Reinsurance Reserve:

| | Additions on account of policies and guaranteed searches | Withdrawals upon expiration of 180 month period |
|---|---|---|
| 1960 | $361,082.38(A) | $116,058.14 |
| 1961 | 415,860.62 | 279,168.93 |
| 1962 | 468,043.51 | 238,652.48 |
| 1963 | 498,195.86 | 247,989.65 |
| 1964 | 496,432.59 | 187,153.66 |

(A) Excluding reinsurance reserve acquired from Abstract and Title Insurance Corporation as of March 6, 1960, date of merger of such company into the plaintiff company.
[A2997]

On plaintiff's Federal income tax returns for each of the calendar years 1960 through 1964, the net increases in its Statutory Reinsurance Reserve deducted as unearned premiums, resulting from the aforesaid additions and withdrawals were:

| | |
|---|---|
| 1960 | $245,924.24 |
| 1961 | 136,691.69 |
| 1962 | 229,391.03 |
| 1963 | 250,206.21 |
| 1964 | 309,278.93 |

11. Included in the aforesaid additions, withdrawals and net increases, respectively, in the Statutory Reinsurance Reserve set forth in paragraph 10 above were the following amounts:

Attributable to policies on which risk insurance was purchased from Companies Authorized to do Business in New York

| | Additions | Withdrawals | Net Increase |
|---|---|---|---|
| 1960 | $6,631.83 | | $6,631.83 |
| 1961 | 6,224.52 | | 6,224.52 |
| 1962 | 3,385.33 | | 3,385.33 |
| 1963 | 3,711.99 | | 3,711.99 |
| 1964 | 5,748.12 | | 5,748.12 |

Attributable to policies on which risk insurance was purchased from Companies not Authorized to do Business in New York

| | Additions | Withdrawals | Net Increase |
|---|---|---|---|
| 1960 | $9,478.64 | | $9,478.64 |
| 1961 | 13,971.28 | | 13,971.28 |
| 1962 | 7,813.66 | | 7,813.66 |
| 1963 | 8,359.38 | | 8,359.38 |
| 1964 | 16,728.21 | | 16,728.21 |

Total net increase in Statutory Reinsurance Reserve attributable to policies on which risk insurance was purchased

| |
|---|
| $16,110.47 |
| 20,195.80 |
| 11,198.99 |
| 12,071.37 |
| 22,476.33 |

These amounts have been computed in accordance with the reserve requirements of the Insurance Law on the basis of the portion of the face amount of policies with respect to which plaintiff had purchased risk insurance.

11a. The defendant takes the position that Rev.Rul. 68–234, I.R.B. 1968–20 (May 13, 1968), applies to the portion of the plaintiff's Statutory Reinsurance Reserve identified in paragraph 11 as "Total net increase in Statutory Reinsurance Reserve attributable to policies on which risk insurance was purchased." The effect of this position is to increase plaintiff's income in each year by the aforesaid amounts Rev.Rul. 68–234 states in part that:

"In computing earned premiums, the portion of the gross premiums that have been paid for reinsurance has already been taken into account as a deduction from gross premiums written. Therefore, in computing earned premiums that portion cannot again be used to compute another deduction from gross premiums written since this would, in effect, allow the same item to be taken into account twice within the meaning of section 832 (d)* of the Code. Commercial Union Assurance Co. v. Commissioner, 144 F.2d 994 (1944).

Accordingly, the taxpayer may not treat as unearned premiums within the meaning of section 832(b) (4) of the Code that portion of the required reinsurance reserve that is applicable to the amount of risks reinsured with another solvent insurance company whether or not authorized to do business in the state."

12. Plaintiff filed its Federal income tax return for each of the calendar years 1960 through 1964 on or about March 15th of each succeeding year.

13. The aforesaid returns as filed by plaintiff showed the respective tax liabilities set forth below, which amounts were duly paid to the District Director of Internal Revenue (Manhattan) New York on or about the following dates:

| | Tax as shown on return | Dates paid |
|---|---|---|
| 1960 | $565,242.02 | September 13, 1960, December 13, 1960, March 15, 1961, June 6, 1961. |
| 1961 | 818,892.95 | September 13, 1961, December 13, 1961, March 12, 1962, June 8, 1962. |
| 1962 | 916,133.42 | September 10, 1962, December 13, 1962, March 13, 1963, June 7, 1963. |
| 1963 | 932,572.01 | September 6, 1963, December 12, 1963, March 10, 1964, June 8, 1964. |
| 1964 | 874,338.40 | April 6, 1964, June 8, 1964, September 15, 1964, December 14, 1964, March 15, 1965, June 11, 1965. |

[A2999]

14. Plaintiff executed Forms 872 with respect to each of the years 1960 through 1964, in accordance with the provisions of Section 6501(c) (4) of the Internal Revenue Code, on or about the following dates:

1960 _____ December 12, 1963, February 26, 1965, February 10, 1966, March 29, 1967, November 14, 1967.

1961 _____ December 1, 1964, February 10, 1966, September 20, 1966, March 29, 1967, November 14, 1967.

1962 _____ October 6, 1965, September 20, 1966, March 29, 1967, November 14, 1967.

1963 _____ September 20, 1966, November 14, 1967.

1964 _____ January 4, 1968.

Accordingly, the period within which taxes due under its Federal income tax returns for each of said years could be assessed was extended until June 30, 1968.

15. On or about February 27, 1968, the District Director issued notices of deficiency with respect to the taxable years 1960 through 1964, in which it was asserted that there were the following deficiencies in income tax in respect of each year:

| | |
|---|---|
| 1960 | $32,622.23 |
| 1961 | 9,525.00 |
| 1962 | 12,722.89 |
| 1963 | 15,937.32 |
| 1964 | 14,391.48 |

16. On February 28, 1968, plaintiff executed Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Over-assessment with respect to each of the years 1960 through 1964.

17. On or about April 5, 1968, plaintiff paid the alleged deficiencies with

---

* Section 832(d) is now 832(e) of the Code.

respect to the years 1960 through 1963 inclusive as shown in paragraph 15 above, together with the following amounts of interest thereon:

| | |
|---|---|
| 1960 | $13,776.41 |
| 1961 | 3,450.92 |
| 1962 | 3,846.15 |
| 1963 | 3,861.63 |

On or about April 15, 1968, plaintiff paid the alleged deficiency described in paragraph 15 above with respect to the year 1964, together with interest thereon of $2,627.34.

18. The following deficiencies were attributable to the exclusion of the amounts described in paragraph 11 above in determining the amount of unearned premiums in each of the years 1960 through 1964:

| | |
|---|---|
| 1960 | $ 8,337.44 |
| 1961 | 10,501.82 |
| 1962 | 5,823.47 |
| 1963 | 6,277.11 |
| 1964 | 11,238.17 |
| | $42,218.01 |

19. On or about July 1, 1968, plaintiff filed timely and separate claims for refund of its income taxes for 1960 through 1964 for the amounts set forth in paragraph 18 above plus the following amounts of interest:

| | |
|---|---|
| 1960 | $3,537.92 |
| 1961 | 3,804.80 |
| 1962 | 1,760.42 |
| 1963 | 1,520.94 |
| 1964 | 2,048.72 |
| | $12,672.80 |

The grounds for refund set forth in those claims for refund were substantially the same as those set forth in the petition herein.

20. On or about January 27, 1969, plaintiff received from defendant a notice disallowing in full the claim for refund with respect to the year 1964, described in paragraph 19 above.

21. Plaintiff filed its petition after more than six months had elapsed since the filing of claims for refund for the years 1960 through 1963.

22. No payment has been made by the defendant to the plaintiff of any part of the tax or interest to which such refund claims relate.

23. Claims for refund described in paragraph 19 above and the events described in paragraphs 20 and 21 above constitute the basis of this suit.

24. All conditions precedent to the maintenance of this suit by plaintiff have been performed or have occurred and no assignment or other transfer of the claims set forth herein has been made.

25. There are no issues of fact to be tried, and subject to approval by Commissioner Wood pursuant to Rule 131(c) of the Rules of this Court, this case shall be submitted to the full Court for a decision as to the right of plaintiff to recover any amount, and the amount of recovery and offsets, if any, shall be determined in accordance with the procedure prescribed by Rule 131(c) of the Rules of this Court.

The question before the court is whether the amounts segregated in plaintiff's statutory reinsurance reserve that were computed on the basis of the portion of the face amounts of those policies on which plaintiff purchased risk reinsurance, constituted unearned premiums within the meaning of Section 832 of the Internal Revenue Code, and were thus deductible from its gross income at the end of the respective taxable years involved.

The amounts in the fund computed on policies where none of the risk was reinsured by the plaintiff are not involved in this case, as the IRS readily admits that such amounts are deductible as unearned premiums within the meaning of Section 832 from plaintiff's gross income at the end of the taxable year. The problem exists only with reference to policies where the plaintiff has purchased reinsurance to protect itself against a portion of the possible loss in excess of the first $5,500,000 on any single policy issued by it. In such instances, the plaintiff has deducted the cost of the reinsurance as an ordinary and necessary business expense, which has been

allowed by the IRS. In such reinsurance cases, the plaintiff has also deducted the amounts placed in the Statutory Reinsurance Reserve as unearned premiums from its gross income at the end of the taxable year, which has had the effect of reducing its income tax for the years involved. Of course, the amounts so placed in the fund were computed on the entire face amounts of the policies as originally issued by the plaintiff, which included the portions of the policies which were later reinsured, as well as those portions which were not covered by reinsurance. The government contends that the portion of the fund that is computed on the part of the policies covered by reinsurance does not constitute unearned premiums within the meaning of Section 832 of the Code, is non-deductible as such, and is taxable as a part of the plaintiff's gross income. It also asserts that to allow the plaintiff to deduct such amounts from its gross income is the same as allowing it a double deduction of the same item inasmuch as plaintiff has already deducted the cost of the reinsurance as an ordinary and necessary business expense. The government argues that the plaintiff is required to reduce its statutory unearned premium reserve by the amounts paid and deducted for reinsurance purchased on its policy risks in excess of $5,500,000.

The plaintiff controverts and disputes these arguments of the government. It says that the reserve fund constitutes unearned premiums within the meaning of the Code because all of it is held in trust and cannot be used by the plaintiff for a period of 180 months. Plaintiff contends that its treatment of the entire reserve fund as unearned premium does not result in a double deduction of the same item, and that premiums paid for reinsurance and unearned premiums are not the "same items."

The case has been well briefed and argued by able counsel for both parties. After careful consideration of the law and the facts, the court has concluded that plaintiff is entitled to recover.

The controlling statute is Section 832 of the Internal Revenue Code of 1954 (26 U.S.C. § 832 (1964)).[2] Applicable portions of this section are as follows:

§ 832. *Insurance Company taxable income.*

(a) *Definition of taxable income.*

In the case of an insurance company subject to the tax imposed by section 831, the term "taxable income" means the gross income as defined in subsection (b) (1) less the deductions allowed by subsection (c).

(b) *Definitions.*

In the case of an insurance company subject to the tax imposed by section 831—

(1) *Gross income.*

The term "gross income" means the sum of—(A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners,

\* \* \* \* \* \*

(3) *Underwriting income.*

The term "underwriting income" means the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred.

(4) *Premiums earned.*

The term "premiums earned on insurance contracts during the taxable year" means an amount computed as follows:

(A) From the amount of gross premiums written on

---

**2.** Subsequent amendments did not make any changes that affect the problem before the court.

insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance.

(B) To the result so obtained, add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year.

\*   \*   \*   \*   \*   \*

(6) *Expenses incurred.*

The term "expenses incurred" means all expenses shown on the annual statement approved by the National Convention of Insurance Commissioners, and shall be computed as follows: To all expenses paid during the taxable year, add expenses unpaid at the end of the taxable year and deduct expenses unpaid at the end of the preceding taxable year. For the purpose of computing the taxable income subject to the tax imposed by section 831, there shall be deducted from expenses incurred (as defined in this paragraph) all expenses incurred which are not allowed as deductions by subsection (c).

(c) *Deductions allowed.*

In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions:

(1) all ordinary and necessary expenses incurred, as provided in section 162 (relating to trade or business expenses);

\*   \*   \*   \*   \*   \*

(e) *Double deductions.*

Nothing in this section shall permit the same item to be deducted more than once. \* \* \*

It is clearly provided in Section 832(b) (4) (B) that an insurance company is allowed to "deduct unearned premiums on outstanding business at the end of the taxable year." It follows, therefore, that if the premiums involved here are unearned premiums, the plaintiff is entitled to deduct them from its gross income. We think they are unearned premiums for several reasons.

In the first place, in the absence of any definition of "unearned premiums" in Section 832 of the Code, the courts which have considered the problem with respect to title insurance, have held that the portion of the premiums that may not be used by the taxpayer but are impressed with a trust in favor of policyholders until the end of the statutory period (180 months here) are unearned premiums during such period. This was the holding of the court in Early v. Lawyers Title Ins. Corp., 132 F.2d 42 (4th Cir. 1942), where it was stated:

\* \* \* [I]f any portion of the premiums, in consideration of the time element, is given, either by law or contract, the status ordinarily accorded an unearned premium in insurance law during any portion of the period for which the risk is operative, there is no reason why it should not be treated as an "unearned" premium within the meaning of the taxing statute during this period. \* \* \*

\* \* \* This means that they are not available to the company for its ordinary purposes, until the times limited in the statute have expired, but, until then, are held in trust for the benefit of the contract holders. If the company should in the meantime become insolvent, they would be available as unearned premiums for reinsurance of the contracts, or if not used for that purpose would belong to the contract holders. \* \* \* [*Id.* at 44–45.]

This principle was followed in Title & Trust Co. of Florida v. United States, 243 F.Supp. 42 (M.D.Fla.1965), aff'd per

curiam, 360 F.2d 285 (5th Cir. 1966), when the court said:

> \* \* \* Premiums of a title insurance company constitute income and should be taxed as such. Where a state statute provides for the creation of a reserve which is segregated from the general assets of the company and which will be treated as earned at the expiration of a specific period of time which is commensurate with the period of probable risk, it has endowed such "unearned premiums" with all those attributes which would be present in the case of unearned premiums on other kinds of insurance. \* \* \* [*Id.* at 44.] [3]

The unearned premium doctrine has been held applicable to reserves established pursuant to Section 434 of the New York Insurance law. *See* Home Title Guaranty Co., 15 T.C. 637 (1950), acq. 1957–1 Cum.Bull. 4; and City Title Ins. Co., Tax Court Mem. 1955–233 (P–H Memo. T.C. ¶ 55,233) (14 CCH Tax Ct.Mem. 939, 1955).

In the next place, once a portion of a premium is placed in the reserve fund, it becomes a part of the entire reinsurance reserve fund and is no longer associated with a particular policy. In determining the tax status of such amounts, it is immaterial what premiums were received under certain policies. See Home Title Guaranty Co., *supra,* and City Title Ins. Co., *supra.* Consequently, we cannot approve the government's attempt to associate or treat portions of the reserve fund with certain policies. All amounts placed in the reserve fund remain there as unearned premiums for 180 months for the protection of the policyholders, and, in the event of liquidation, the fund will be distributed to the insureds or used by the receiver or trustee in bankruptcy to purchase reinsurance for the benefit of the insureds. In the meantime, if the plaintiff purchases reinsurance, this does not change the character or status of the premiums in the reserve fund.

Furthermore, Treasury Regulation 1.-801–3 defines unearned premiums as follows:

§ 1.801–3 Definitions.

\* \* \* \* \* \*

(e) *Unearned premiums.* The term "unearned premiums" means those amounts which shall cover the cost of carrying the insurance risk for the period for which the premiums have been paid in advance. Such term includes all unearned premiums, whether or not required by law.

\* \* \* \* \* \*

The premiums in the reserve fund in this case appear to meet the requirements of this definition.

■ A further reason for treating these funds as unearned premiums, is the fact that they are deposited in trust for 180 months and cannot be used in any way by the taxpayer. At the end of this period, the funds are released to it and they are included in plaintiff's taxable income and the taxes are paid. There is no attempt by plaintiff to escape the payment of income taxes on these funds. It seeks merely to defer the payment until such time as it has the beneficial use of the funds. We think this is proper.

■ Finally, the funds should be considered as unearned premiums because in the stipulation of facts both parties agreed that they were unearned premiums within the meaning of Section 832 of the Internal Revenue Code. Although defendant thus agreed, it now takes the position that the purchase of reinsurance by the plaintiff somehow changes the character of some portion of the unearned premiums so that they may no longer be so classified. It makes this contention even though no part of the fund was withdrawn or used by the plaintiff or affected in any way. We

---

3. See also Washington Title Ins. Co. v. United States, 135 F.Supp. 426, 133 Ct. Cl. 164 (1955); and Title & Trust Co., 15 T.C. 510 (1950), aff'd per curiam, 192 F.2d 934 (9th Cir. 1951).

do not agree. Once the premiums became a part of the reserve fund, they became unearned premiums for the full statutory period and the purchase of the reinsurance by the plaintiff did not affect their status as such.

■ We conclude that the amounts in the reserve fund were unearned premiums for 180 months and were deductible as such from plaintiff's gross income at the end of the taxable years involved, as authorized by Section 832 of the Code, unless such a deduction constituted a double deduction of the same item. We will now consider that problem.

The government contends that inasmuch as plaintiff has already deducted the cost of the reinsurance as an ordinary and necessary business expense, the additional deduction of the portion of the unearned premiums attributable to the policies reinsured from plaintiff's gross income at the end of the taxable year amounts to a double deduction of the same item.

Section 832(e) of the Code provides:

(e) *Double deductions.*

Nothing in this section shall permit the same item to be deducted more than once.

Also, Rev.Rul. 68–234, 1968–1 Cum. Bull. 321 (May 13, 1968), provides in part:

In computing earned premiums, the portion of the gross premiums that have been paid for reinsurance has already been taken into account as a deduction from gross premiums written. Therefore, in computing earned premiums that portion cannot again be used to compute another deduction from gross premiums written since this would, in effect, allow the same item to be taken into account twice within the meaning of section 832(d) [this is now section 832(e)] of the Code. Commercial Union Assurance Co. v. Commissioner, 144 F.2d 994 (1944).

Accordingly, the taxpayer may not treat as unearned premiums within the meaning of section 832(b) (4) of the Code that portion of the required reinsurance reserve that is applicable to the amount of risks reinsured with another solvent insurance company whether or not authorized to do business in the state.

The defendant argues that the above subsection (e) of Section 832 and Rev. Rul. 68–234 prohibit the deduction claimed by the plaintiff here. It says that if a deduction is allowed for reinsurance premiums paid and such premiums constitute a portion of plaintiff's unearned premiums, then the same item is being deducted twice.

The error in this contention of defendant is its assumption that the reinsurance premiums paid constitute a portion of plaintiff's unearned premiums. This is not the case at all. The unearned premiums in the trust fund are not withdrawn or used in any way. In fact, the reinsurance premiums paid are not the same in amount as that portion of the unearned premiums attributable to the reinsured policies which is in the trust fund. This will be shown more explicitly below.

The obvious purpose of Section 832(e) is to prevent expenses and losses authorized to be deducted under 832(b) (3) in arriving at underwriting income from being deducted again under 832(c) in computing the taxable income of the taxpayer. There is nothing to indicate that it was intended to prevent the deduction of unearned premiums which are in a trust fund and beyond the reach of the taxpayer for a stated period as required by law. *See* Allstate Fire Ins. Co., 47 T.C. 237, 243 and footnote 7 at 242 (1966), reviewed by the court, acq. 1967–2 Cum.Bull. 1, government appeal dismissed per stipulation, 6 P–H 1967 Fed. Taxes, ¶ 56,396 at 56,337.

The deduction complained of in this case is not a true deduction of income, but is actually a deferral of the unearned premiums for a period of 180 months, after which they will be included in income and taxable. In our opinion, such a deferral does not conflict with the

double deduction prohibited by 832(e), which obviously contemplates permanent deductions from income with permanent reductions in income subject to income tax. That is not the case before us.

Furthermore, the deduction (deferral) of the unearned premiums and the deduction of the premiums paid for reinsurance are not deductions of the same item, and, therefore, do not conflict with 832(e). They are similar to multiple deductions such as those for exempt interest dividends, business expenses, and contributions, which are not considered as double deductions. This is true for several reasons. In the first place, the two deductions here are not of the same character. Also, it is clear that no part of the trust funds were used to purchase reinsurance, nor could it be. The reinsurance premiums were more in amount than the sums in the trust fund attributable to the portions of the policies reinsured. The deduction of the unearned premiums was not permanent, but was simply a deferral of such premiums for 180 months when it would be subject to tax.

The defendant says there is a possibility that the deferred unearned premiums may never be taxed. This is unpersuasive. With income tax rates increasing from year to year, there is more likelihood the plaintiff will have to pay more taxes on the deferred premiums fifteen years later than it would have had to have paid on the same premiums during the years the original title policies were written. There is little, if any, chance the government will be prejudiced and it will probably be benefited.

The defendant argues that the taxpayer should be required to reduce the unearned premiums in the trust fund by the exact amount, dollar for dollar, that it spent to purchase the reinsurance policies. This procedure would lead to an unrealistic and unsound result, which can be best illustrated by applying it to the example described in the stipulation of facts. In that example, policy No. 4090889 was issued by plaintiff in the sum of $8,000,000 for which it received a total premium of $16,177. This premium was included in its income, less $1,001.50 which was added to the trust fund as unearned premiums where it will remain for 180 months. The plaintiff then purchased $3,000,000 of reinsurance for which it paid a premium of $1,950, which was deducted as an ordinary and necessary expense. Under this arrangement ⅝ of the $1,001.50 that went into the trust fund (in the sum of $625.94) could be deducted by plaintiff and allowed by defendant as unearned premiums in the trust fund because it is attributable to the $5,000,000 part of the policy not reinsured. This leaves $375.56 of the $1,001.50 that went into the trust fund which is attributable to the $3,000,000 (⅜) part of the policy that was reinsured. The defendant contends that the trust fund must be reduced not only by the $375.56, but by the entire $1,950 the plaintiff paid for the $3,000,000 reinsurance. This is almost double the total amount of $1,001.50 that went into the trust fund, including the $625.94 not in controversy, attributable to ⅝ of the policy. This would mean that the difference between $1,950 paid for reinsurance and $375.56 attributable to ⅜ of the policy reinsured, which is the sum of $1,574.44, would have to come out of the trust fund, even though it constitutes a part of unearned premiums not connected in any way with reinsurance. This would be an unreasonable result that we are unwilling to read into the meaning of Section 832.

The plaintiff cites Fidelity & Deposit Co. v. United States, 50–1 USTC ¶ 9106 at 12,121 (D.Md.1949), aff'd per curiam, 177 F.2d 805 (4th Cir. 1949), rehearing denied, 178 F.2d 753 (4th Cir. 1949) in support of its position that there has been no double deduction of the same item in this case. The defendant says this case was incorrectly decided and no longer retains vitality because of the decisions in Commissioner of Internal Revenue v. General Reins. Corp., 190 F.2d 148 (2d Cir. 1951) and Commissioner of Internal Revenue v. United States Guarantee Co., 190 F.2d 152 (2d Cir.

1951). However, the plaintiff points out that there were two separate points argued by the government in the *Fidelity & Deposit Co.* case, namely, that a taxpayer should not be permitted to claim a double deduction of the same item, and secondly, that the Convention Form (The underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners) was not binding for Federal income tax purposes. Plaintiff says the court in Commissioner of Internal Revenue v. General Reins. Corp., *supra,* and Commissioner of Internal Revenue v. United States Guarantee Co., *supra,* rejected the proposition that the Convention Form was binding, but did not pass on the question as to the meaning of the prohibition against double deductions as expressed in Section 832(e), and no court has ruled contrary to the decision in the *Fidelity & Deposit Co.* case on this point. Therefore, it contends that the opinion in that case is correct. The court there said:

> We indicate briefly our views on the questions raised by the petition. On the question of double deduction, the case cannot be distinguished from Commissioner of Internal Revenue v. New Hampshire Fire Ins. Co., 1 Cir., 146 F.2d 697, upon which our decision was based. There was, in fact, no double deduction. It was perfectly proper for taxpayer to deduct premiums paid for reinsurance, since it did not get back the premiums for reinsurance once they were paid; and where the reinsurance was in an unauthorized company, it was proper, also, to deduct the reserve that the law required to be maintained against such unauthorized insurance, since the assets embraced by this reserve were not available to taxpayer. The amount tied up in the reserve was, of course, subjected to taxation as it was released. This was not, as argued, an ordinary reserve against contingent liabilities, but a reserve required by law such as we dealt with in Early v. Lawyers Title Ins. Corp., 4 Cir., 132

F.2d 32, cited in our memorandum opinion. [178 F.2d at 754.]

We think the reasoning of the court is sound and supports plaintiff's contention that there was no double deduction of the same item in our case.

The defendant insists that the case of Commercial Union Assurance Co. v. Commissioner of Internal Revenue, 144 F.2d 994 (2d Cir. 1944), aff'g 1 T.C. 1166 ·(1943), requires us to hold there was a double deduction of the same item here. We do not agree. The cases are clearly distinguishable on the facts. There a foreign insurer sought to deduct foreign office expenses allocable to income in the United States. Such an expense deduction was allowable in proportion to income in the United States as compared to worldwide income. However, in making such a deduction, the company used gross income *before* making any other deductions, exclusions, or credits. Then the company deducted tax exempt interest and the 85 percent dividends paid by domestic corporations, which was also exempt, from its gross income in the United States. The IRS said this was a double deduction. The court agreed, saying:

> * * * It is in general thus provided that expenses, losses and other deductions which can be definitely allocated to some item or class of what is defined as gross income from sources within the United States may be deducted therefrom and that where there can be no such definite allocation the deductions shall be taken in the ratio which the corporation's gross income from sources within the United States bears to its gross total income.

> The first question involves the proper factors which should be given effect in establishing this ratio. The taxpayer's gross income from sources within the United States included tax-free interest on federal obligations and on those of states and their political subdivisions, and dividends paid by domestic corporations, of which 85% was also tax-free to the petitioner. It

had operating expenses and had paid British taxes which could not be allocated except by means of the ratio above mentioned. Because § 204(e) forbids a deduction of the same item twice, the petitioner has not been allowed to include in the numerator of the fraction by which the ratio is represented its United States tax-free income though that amount was included in the denominator. · * * * [144 F.2d at 995.] [4]

The court said further:

* * * To be sure, the two deductions are not exactly the same because what we shall call the first [that allowable under subsection (a) (2) (A) and (B)] frees the entire amount from taxation while that allowable under § 232 frees additional income from taxation only to the extent that the sums first deducted are used to increase the ratio by which this amount of the second deduction is determined. But this difference exists only in the manner of computing the amount of a second deduction on account of the same item. * * * [*Id.* at 996.]

It is clear that the facts in that case are wholly different to those in our case and the double deduction of the same item there is not the same or even similar to the deductions before us. *See also,* Allstate Fire Ins. Co., *supra,* which discusses the *Commercial Union* case and limits its application to the system employed by foreign insurance companies to apportion expenses between foreign income and that received in the United States, saying:

* * * Each of the foreign insurance companies deducted tax-exempt interest and domestic dividends in arriving at U. S. taxable income. They then wanted to include them in gross income for the purpose of determining the allocable portion of general expenses to U. S. source income under the formula provided by section 119 (see fn. 8, *supra*). The net effect was to deduct such items for one purpose

and add them back to create another deduction. That the courts had the prevention of this type of transaction in mind when they invoked section 204(e) is borne out by a close examination of the * * * language which construed the words "same item" as used in that section: * * * [47 T.C. at 244.]

Moreover, in the *Commercial Union* case, there was a permanent reduction in income which would have reduced the income tax and allowed some of the income to escape taxation permanently. That is not the case before us.

The defendant also cites Colonial Surety Company v. United States, 178 F. Supp. 600, 147 Ct.Cl. 643 (1959) in support of its theory that plaintiff must reduce the reserve trust fund by the amounts paid and deducted as a business expense for reinsurance. That case is unlike the one before us and is distinguishable on the facts. There the taxpayer was a casualty insurance company engaged in the business of insuring damaged automobiles. It ceded 90 percent of the business by way of reinsurance with the Insurance Company of North America (INA), including 90 percent of the premiums. INA paid plaintiff a commission of 30 percent of the premiums for writing the business. The insurance commissioner of Pennsylvania required the plaintiff to prorate the 30 percent of the premiums paid to it in advance as commissions over the taxable years during which the policy was in force in proportion to the time the policy was in force in each taxable year. The taxpayer then claimed it was required to report as income the commissions received less a reserve for unearned *commissions* under Section 204(b) (5), 26 U.S.C. (now Section 832(b) (4)). This court held that the taxpayer was not entitled to deduct a reserve set up for the possibility it might have to return a part of the commissions, saying:

Since the income was commissions on business written for another, and

---

4. Section 204(e) is the same as Section 832(e) in our case.

**1376**

not premiums the insurer was entitled to, it is clear that the taxpayer is not entitled to deduct a reserve set up in anticipation of the possibility that some part of the commissions will have to be refunded. * * *

* * * * * *

This unearned commission reserve cannot be considered as an unearned premium reserve. It was set up for the sole purpose of taking care of the possibility that some part of the commission might have to be returned. * * * [*Id.* at 645–646, 178 F.Supp. at 602.]

* * * The commissions were paid on only this 90 percent. It is no more entitled to deduct a reserve for the possibility that it might have to return a part of the commission than is the familiar individual insurance agent, who solicits and secures the business. [*Id.* at 647, 178 F.Supp. at 603.]

Thus, it can be seen that in that case no title insurance was involved. The plaintiff sought to deduct unearned commissions and not unearned premiums. There was no trust fund of unearned premiums beyond the reach of the taxpayer for a statutory period as here.

The government argues that the portion of the trust fund attributable to the parts of the policies reinsured should not be considered as unearned premiums within the meaning of Section 832 for the reason that the taxpayer is no longer carrying the risk on the parts reinsured. We cannot accept this theory. Even though plaintiff has obtained reinsurance, it is still liable to the policyholder in case of loss and is, therefore, still carrying the risk despite the reinsurance. A title insurer ordinarily fully earns a premium when it is paid for title insurance, and the premium is considered fully earned when received. *See* Early v. Lawyers Title Ins. Corp., 132 F.2d 42, 44 (4th Cir. 1942). However, this is not true with respect to the premiums put in a trust fund for a specified period of time in compliance with a state statute

as here. This was the situation in the case last cited above. The court there held:

The liability under a title insurance policy, * * * is outstanding as a continuing liability of the company to the policyholder; and, in recognition of this fact, the Virginia statute requires that a certain portion of the premiums, 10%, be set aside and held intact for a period of time for the discharge of this liability. The sums thus set aside "at all times and for all purposes" are, by mandate of the statute, to "constitute unearned portions of the original premiums". This means that they are not available to the company for its ordinary purposes, until the times limited in the statute have expired, but, until then, are held in trust for the benefit of the contract holders. If the company should in the meantime become insolvent, they would be available as unearned premiums for reinsurance of the contracts, or if not used for that purpose would belong to the contract holders. Johnson v. Button, 120 Va. 339, 91 S.E. 151, 153; Lovell v. St. Louis Mutual Life Ins. Co., 111 U.S. 264, 274, 4 S.Ct. 390, 28 L.Ed. 423; 32 C.J. p. 1040. [*Id.* at 44–45.]

* * * * * *

The Collector relies upon the regulation of the Commissioner of 1924, art. 692, III–16–1510 I.T. 1981, to the effect that "the provisions of the Revenue Act * * * with respect to the division of premiums received by insurance companies into earned and unearned premiums are not applicable to title insurance companies whose premiums are earned in full at the time their services are rendered". It is manifest, however, that this regulation can have no application to a situation where, as here, a portion of the premium is in fact unearned as the result of a statutory provision, which withdraws it from the control of the company and requires that it be held in trust for the contract holder during the portion of the period of risk which

the statute prescribes. We agree that a statute of the state could not be given the effect of withdrawing from taxation under the Revenue Act what was in fact an earned premium by the mere device of calling it unearned; but the Virginia statute does more than this. It gives to the portions of the premiums which it requires to be placed in the reserve all of the attributes that pertain to unearned premiums, i. e. it withdraws them from the power of the company to use them for its general purposes and impresses them with a trust in favor of contract holders until the risk shall have been carried for the period that the statute prescribes. Until this period has expired, the company has no more control over them than a life insurance company has over the unearned portion of the premium paid for life insurance or than a fire insurance company has over the portion of the premium applicable to an unexpired risk. Until then, the company cannot be truly said to have earned the portion of the premium which the law requires it to reserve and hold in trust during this crucial period of risk. [*Id.* at 45–46.]

The foregoing case is very much in point and supports plaintiff's position.

## CONCLUSION OF LAW

We hold that the premiums in the reserve trust fund were unearned premiums within the meaning of Section 832 and were deductible from the gross income of the plaintiff at the end of the tax years involved, respectively. We further hold that in thus deducting such unearned premiums there was no double deduction of the same item from plaintiff's taxable income. The plaintiff is entitled to recover. Accordingly, judgment is entered for the plaintiff in the sum of $42,218.01 for taxes paid, together with the sum of $12,672.80 for interest paid, and such other interest and amounts to which it may be entitled. The case is remanded to the trial com-

missioner for a determination of the amount of recovery, less offsets, if any, in accordance with Rule 131(c) of this court.