IN THE OREGON TAX COURT
REGULAR DIVISION
Corporation Excise Tax

| | | |
|---|---|---|
| APPLE INC. AND U.S. SUBSIDIARIES, | ) | |
| | ) | |
| Plaintiffs, | ) | **TC 5416** |
| v. | ) | |
| | ) | **ORDER GRANTING PLAINTIFFS'** |
| DEPARTMENT OF REVENUE, | ) | **MOTION FOR PARTIAL SUMMARY** |
| State of Oregon, | ) | **JUDGMENT AND DENYING** |
| | ) | **DEFENDANT'S CROSS-MOTION FOR** |
| Defendant. | ) | **PARTIAL SUMMARY JUDGMENT** |

## I. INTRODUCTION

This corporation excise tax case is before the court on the parties' cross-motions for

partial summary judgment. The tax year at issue began on September 29, 2013, and ended on

September 27, 2014. (Ptfs' 1st Decl of Berwick, Ex 6 at 1; Ex 7 at 1.) For purposes of this

order, references to "Plaintiffs" include Apple Inc. (the common parent corporation) and two

wholly owned subsidiaries, both of which are corporations: AppleCare Service Company, Inc.

(AppleCare) and Apple Insurance Company (Apple Insurance).

Defendant has assessed an income tax deficiency, asserting among other issues that the

consolidated Oregon corporation excise tax return understates the percentage of "sales" (defined

as "gross receipts") attributable to Oregon, thus understating Oregon's apportioned share of the

overall taxable income shown on the return. *See* ORS 314.650 (apportioning business income to

Oregon based on "sales"); ORS 314.610(7) (defining sales as "all gross receipts of the taxpayer"

except those specifically allocated to a state as nonbusiness income).[1] It is important to state at the outset of this order that Plaintiffs included the *income* of both AppleCare and Apple Insurance on the consolidated Oregon return. The issues in this order are limited to how that total income of Plaintiffs must be *apportioned* to Oregon. According to Defendant, a portion of the understatement arises because Plaintiffs should have counted the full amount paid by retail customers for "extended service" plans (Plans) covering devices sold in Oregon as "sales of the taxpayer in this state," which is the numerator of the fraction in the apportionment percentage.

Plaintiffs seek partial summary judgment, asking the court to conclude that the "sales" in the numerator of the apportionment factor shown on the consolidated Oregon return should exclude at least 95 percent of Oregon gross receipts paid by retail customers for Plans.[2] The court summarizes Plaintiffs' reasoning as follows: (1) AppleCare issued the Plans to retail customers but reinsured 95 percent of the risk with Apple Insurance and forwarded ("ceded") 95 percent of the premium to Apple Insurance; (2) federal income tax law treated AppleCare and Apple Insurance as "insurance companies" and defined AppleCare's "gross income" as excluding the 95 percent of premiums ceded to Apple Insurance; (3) likewise, the amount of AppleCare's "gross receipts" under Oregon law governing apportionment excluded 95 percent of the premiums because "gross receipts" for Oregon apportionment purposes corresponds to "gross

---

[1] Unless otherwise specified, the court's references to the Oregon Revised Statutes (ORS) are to the 2013 edition.

[2] Plaintiffs' motion requests the following rulings:

"1. With respect to AppleCare * * * the numerator of [the] Oregon sales factor [on the consolidated Oregon return] only includes receipts that are included in [AppleCare]'s gross income.

"2. As Apple Insurance * * * has no Oregon activity or tax nexus, no portion of its receipts may be included in the numerator of [the] Oregon sales factor."

(Ptfs' Mot Part Summ J at 1.)

income" as determined under federal income tax law; and (4) under ORS 317.715(4)(b) the 95 percent of premiums ceded to Apple Insurance cannot be counted in the numerator on the consolidated Oregon return because Apple Insurance did business only in Arizona.

Defendant has cross-moved for partial summary judgment, asking the court to "find that the numerator of Apple's sales factor must include all gross receipts from Oregon purchasers of extended warranty service contracts." (Def's Cross-Mot Part Summ J and Resp at 10.) Defendant contests several points of Plaintiffs' reasoning. As its primary argument, Defendant frames the transactions as sales by Apple Inc. (not AppleCare or Apple Insurance) that are sourced to Oregon whenever the sale of the protected device is sourced to Oregon.

## II. FACTS

The court finds that the following facts are not disputed.

The Plans cover certain claims by retail device customers for hardware service and technical support. (*See* Ptfs' 3rd Decl of Berwick, Exs 9, 10) (sample Plans). Plans are "sold through Apple Inc." as well as by authorized third-party retailers. (*See* Ptfs' 3rd Decl of Berwick at 2 (referring to "each AppleCare service plan sold through Apple Inc."); Ptfs' 1st Decl of Berwick at 2 (Plans sold "by Apple-authorized retail dealers").

Plaintiffs were included in a consolidated federal income tax return for the tax year at issue. (*See* Ptfs' 1st Decl of Berwick at 4.) Plaintiffs are engaged in a single unitary business. (*See Id*.) The income of Plaintiffs was included in a consolidated Oregon corporation excise tax return for the tax year at issue. (*See id.*, ¶¶ 24-25; Ptfs' Compl, Ex 2 at 2-3 (Conference Decision Letter; stating that AppleCare and Apple Insurance "were included in the Taxpayer's Oregon consolidated return").

/ / /

The Internal Revenue Service (IRS) has ruled that AppleCare and Apple Insurance are "insurance companies" taxable under Section 831 of the Internal Revenue Code.[3] (*See* Ptfs' 1st Decl of Berwick at 2, 3; Ex 1 at 6, Ex 3 at 5). However, based on ORS 646A.154(1), (8), and (9), AppleCare treated itself and the Plans as exempt from the Oregon Insurance Code, and AppleCare did not treat itself as an "insurer" for Oregon corporation excise tax purposes under ORS 317.010(11).[4] (*See* Ptfs' Mot Part Summ J at 4 n 3.) AppleCare has not registered or been admitted to do business as an insurance company in any state. (*See* Ptfs' 1st Decl of Berwick at 2.) Apple Insurance was an Arizona insurance company, domiciled in Arizona, but was not an admitted insurer in Oregon. (*See Id.* at 3.)

### III. ISSUES

(1)      As to AppleCare's contribution to the sales factor on the consolidated Oregon return for the year at issue, does the numerator include only amounts included in AppleCare's gross income for federal income tax purposes?

/ / /

/ / /

---

[3] Unless otherwise indicated, references to the Internal Revenue Code (Code, or IRC) are to the Internal Revenue Code of 1986, as amended and in effect for the tax year at issue. References to "Section" are to sections within the Code.

[4] The cited portions of ORS 646A.154 provide, in relevant part:

"(1)(a) For the purposes of this section, a service contract is a contract or agreement to perform or indemnify for a specific duration the repair, replacement or maintenance of property for operational or structural failure that results from a defect in materials, workmanship or normal wear and tear, with or without an additional incidental provision to pay indemnity under limited circumstances * * * .

"* * * * *

"(8) Service contract sellers and employees of service contract sellers that market, sell or offer to sell service contracts for obligors who comply with this section and ORS 646A.156 and 646A.158 are exempt from the requirements of the Insurance Code including, but not limited to, the requirement to belong to the Oregon Insurance Guaranty Association.

"(9) Obligors that comply with ORS 646A.156 and 646A.158 do not need to comply with the Insurance Code including, but not limited to, the requirement to belong to the Oregon Insurance Guaranty Association."

(2)    Are all gross receipts of Apple Insurance excluded from the numerator of the sales factor on the consolidated Oregon return for the year at issue, on the grounds that Apple Insurance is not subject to Oregon's taxing jurisdiction?

## IV.  ANALYSIS

A.    *Legal Background*

The issues in the parties' cross-motions involve several of the basic steps in determining the Oregon taxable income of a group of related corporations engaged in a multistate business.[5] As background:

*Oregon's incorporation of federal income tax terms.*  Since 1983, the legislature has adopted federal "taxable income" as the starting point in determining the tax base for corporate taxpayers.  *See* ORS 317.010(10) (defining "taxable income"), 317.010(8) (defining "Oregon taxable income"); Or Laws 1983, ch 162, § 7.[6]  The legislature has declared its intention to make "taxable income of a corporation for Oregon purposes * * * the same as it is for federal income tax purposes, subject to Oregon's jurisdiction to tax, and subject to * * * modifications contained in [ORS chapter 317]."  ORS 317.018(1).  The legislature has further declared its intention to achieve that result "by application of the various provisions of the federal Internal Revenue Code relating to the definitions for corporations, of income, deductions, accounting methods, accounting periods, taxation of corporations, basis and other pertinent provisions relating to gross income."  ORS 317.018(2).

/ / /

---

[5] As will be discussed, Plaintiffs argue that a 2017 law changes portions of this background by excluding "any * * * insurer" from a consolidated state return.  Or Laws 2017, ch 316, §§ 2-3 (retroactively amending ORS 317.710 and ORS 317.715).  For the reasons discussed below, the court rejects Plaintiffs' argument.

[6] For personal income taxpayers, federal taxable income has been the starting point since a state constitutional amendment became effective in 1970.  *See* Or Const Art IV, § 32; Or Laws 1969, ch 493, § 3; *see generally Dept. of Rev. v. Wakefield*, 25 OTR 1, 4-5 & nn 4-6.

*"Consolidated returns" under federal and Oregon law.* Since 1986, for any group of affiliated corporations engaged in the same "unitary" business,[7] Oregon has applied the federal "consolidated return" provisions in determining federal and Oregon taxable income.[8] *See* ORS 317.715(1) ("If a corporation required to make a return under this chapter is a member of an affiliated group of corporations making a consolidated federal return under sections 1501 to 1505 of the Internal Revenue Code, the corporation's Oregon taxable income shall be determined beginning with federal consolidated taxable income of the affiliated group * * *."); Or Laws 1984, ch 1, § 20 (Spec Sess). Federal taxable income generally is "computed by aggregating the income and deductions of each member of the group and making certain consolidated return adjustments required by the regulations." Kevin M. Hennessey et al., *The Consolidated Tax Return* ¶ 16.01; *see also id.* at ¶ 1.01 ("The current rules treat the members of a consolidated group as divisions of a single corporation (i.e., single-entity treatment) for most purposes."); *see generally StanCorp Financial Group, Inc. v. Dept. of Rev.*, 21 OTR 120 (2013); *Costco Wholesale Corp. v. Dept. of Rev.*, 20 OTR 537 (2012); *US West /Qwest Dex Holdings v. Dept. of Rev.*, 20 OTR 342 (2011). Although filing a consolidated federal return is elective, that choice, once made, generally carries through for Oregon purposes. Two or more corporations that join in a consolidated federal return and are engaged in the same unitary business must file a consolidated Oregon return. *See* ORS 317.710(5)(a).[9]

---

[7] In this case, the parties agree that Plaintiffs are engaged in a single "unitary business," defined at ORS 317.705(3)(a).

[8] In general, under Section 1504, corporations may join in a consolidated federal return if they are members of an "affiliated group," meaning that the "common parent" owns 80 percent of the stock of each affiliate, by vote and value. *See* IRC § 1504(a). Corporations formed under the law of a foreign country (among others) are not eligible to be included. *See* IRC § 1504(b).

[9] Conversely, a corporation making a separate return for federal income tax purposes must file a separate Oregon return and compute its taxable income separately from any other corporation. *See* ORS 317.710(3).

ORDER GRANTING PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT   TC 5416

*An "insurance company" may be included in a consolidated federal return, but a (taxable) "insurer" may not be included in a consolidated Oregon return.* Federal law allows an "insurance company" (other than a life insurance company) to join in a consolidated federal return with non-insurance companies, as AppleCare and Apple Insurance have done in this case. *See* IRC § 1504(b)(2) (life insurance companies subject to the special taxing regime of IRC § 801 not "includible" in a consolidated federal return). However, an Oregon statutory exception applies to any affiliated group that includes an "insurer," defined by reference to state insurance regulatory law. *See* ORS 317.010(11) (defining "insurer" by reference to ORS 731.082). The exception prohibits an insurer over which Oregon has taxing jurisdiction from joining in a consolidated Oregon return with non-insurer affiliates.[10] *See generally Costco*, 20 OTR 537 (2012).

*On the other hand, a nontaxable insurer's income must be included in the consolidated Oregon return filed by its unitary non-insurer affiliates.* Notwithstanding the Oregon statutory exception, however, this court has long held that the *income* of a unitary insurer affiliate must be included in a consolidated return filed by a non-insurer affiliate, *if the insurer affiliate is not subject to Oregon's taxing jurisdiction.* *See id.* at 544-46 ("Oregon is, in no way, requiring the [insurer] to file a consolidated return or asserting jurisdiction over it. Nor is Oregon directly imposing a tax on the income of the insurance company. * * * Oregon is only taking into account the income of a unitary affiliate in computing, on an apportioned basis, the tax liability

///

---

[10] The exception applies to any corporation that is permitted or required to use "different apportionment factors than a corporation with which it is affiliated." ORS 317.710(5)(b). Defendant has determined by rule that the only such corporations are insurers, as well as certain public utilities that elect to apportion their income using Oregon's former three-factor formula. *See* OAR 150-317.710(5)(b)(1)(a) (renumbered in 2014 as OAR 150-317-0570).

of corporations over which Oregon has jurisdiction."); *Dept. of Rev. v. Penn Independent Corp.*, 15 OTR 68 (1999).

*Federal taxable income, as modified under Oregon law, must be "apportioned" to Oregon based on relative "sales of the taxpayer in this state" compared to "total sales of the taxpayer everywhere."* The consolidated federal taxable income of the entire affiliated group is the starting point to determine Oregon taxable income. *See* ORS 317.715(1). From there, the income of any nonunitary members must be removed, resulting in "modified federal consolidated taxable income." ORS 317.715(3). Oregon-specific additions and subtractions are then made, based on Oregon laws that deviate from or supplement federal income tax law. *See* ORS 317.715(4)(a). After any such additions or subtractions, taxable income must be apportioned to Oregon using a formula prescribed by Oregon law.[11] *See* ORS 317.010(10)(a)-(c). Since 2005, for nearly all taxpayers, the formula consists simply of multiplying the as-modified taxable income by a single fraction, referred to as a "factor" and usually expressed as a percentage.[12] The numerator of the fraction is a taxpayer's "sales" in Oregon, and the denominator is "total sales" everywhere. ORS 314.665(1); ORS 314.650; Or Laws 2005, ch 832, §§ 48, 49; *see also, e.g.,* ORS 314.280 (requiring rules for certain industries); ORS 317.650 to 317.667 (special provisions for insurers).

---

[11] Any income that is "nonbusiness" income, such as certain (1) rents from real property, (2) interest, or (3) dividends, must first be specifically assigned ("allocated") to only one state, rather than apportioned by formula. *See* ORS 314.625.

[12] Before 2005, Oregon's apportionment formula used three factors: property in Oregon vs. everywhere; payroll in Oregon vs. everywhere; and sales in Oregon vs. everywhere. *See* Or Laws 2005, ch 832, §§ 48, 49 (deleted text). Some of Defendant's administrative rules relating to apportionment for the year at issue retain references to the former property and payroll factors. *See, e.g.,* OAR 150-317.715(3)(b) (2013) (renumbered in 2014 as OAR 150-317-0630).

B.      *Parties' Primary Arguments*

The court begins its analysis with the four elements of Plaintiffs' position as framed by the court above, along with Defendant's counterarguments, starting with the third element of Plaintiff's position.

*Point (3):  Does "gross receipts" for Oregon apportionment purposes correspond to "gross income" for federal income tax purposes?*

The court starts with the point numbered (3) above because it is only by defining "gross receipts" that the court can identify which of the three corporations has which amount of gross receipts, and from there move on to determine which amount, if any, can be included in the numerator of the apportionment percentage on the consolidated Oregon return.  This court recently concluded that the Oregon legislature intended the amount of "gross receipts" for apportionment purposes to be determined in accordance with the taxpayer's "accounting method" that is used to determine "gross income" for income tax purposes.  *See Oracle Corp. and Subsidiaries II v. Dept. of Rev.*, 24 OTR 359, 377-79 (2021) (applying *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009); concluding that context provided by statutes, regulations, and case law establish that a "taxpayer's method of accounting determine[s] whether and when an amount [is] counted in 'gross receipts' for income tax purposes.").[13]  At issue in *Oracle* were "deemed dividends" from foreign subsidiaries--amounts not actually paid out by the subsidiaries but

---

[13] The concept of an "accounting method" is fundamental to income taxation.  Core tax accounting principles include the requirements that a taxpayer's method "clearly reflect income," and that the taxpayer apply the same method consistently over time.  *See generally* Boris I. Bittker and Lawrence Lokken, 1 *Federal Taxation of Income, Estates and Gifts*, ¶ 105.1 ("the method of accounting regularly used in keeping the taxpayer's books is ordinarily used to compute taxable income if it clearly reflects income. * * * Once a taxpayer has chosen an accounting period and an accounting method, the taxpayer must ordinarily use them in subsequent taxable years unless the IRS consents to a change * * *."); ORS 317.018(2) (stating legislative intent to apply federal Internal Revenue Code provisions relating to definition of "income," "accounting methods," and "other pertinent provisions relating to gross income.").

nevertheless included in the gross income of the United States parent corporation. *See* IRC §§ 951, 952. The court found that the deemed dividend inclusion requirement in federal income tax law "functions essentially as a mandatory accounting method, preventing domestic controlling shareholders from using the simple postponement of the payment of dividends to indefinitely defer income earned by foreign-incorporated subsidiaries." *See Oracle II*, 24 OTR at 376. Accordingly, the court concluded that deemed dividends were gross receipts of the domestic parent for apportionment purposes. *See id.* at 382.

Applying *Oracle II*, Plaintiffs argue that AppleCare's gross receipts for apportionment purposes must be computed in the same manner as AppleCare's gross income for federal income tax purposes. Defendant has not articulated an argument disagreeing with the application of *Oracle II* principles in this case. Based on the reasoning in *Oracle II*, the court concludes that amounts paid by Oregon retail customers for Plans were gross receipts of AppleCare and Apple Insurance to the extent that those companies were required to include the amounts paid in gross income under federal income tax law.

*Point (1): Did Apple Inc. derive gross receipts from sales of the Plans?*

Plaintiffs contend that only AppleCare and Apple Insurance derived gross receipts from sales of Plans to retail customers, while Defendant contends that all of the gross receipts belonged to Apple Inc. Plaintiffs acknowledge that Plans were "sold through Apple Inc." as well as by authorized third-party retailers. (*See* Ptfs' 3rd Decl of Berwick at 2 (referring to "each AppleCare service plan sold through Apple Inc."); Ptfs' 1st Decl of Berwick at 2 (Plans sold "by Apple-authorized retail dealers"). However, Plaintiffs argue that Apple Inc. performed this activity solely as agent for AppleCare. Plaintiffs presented employee testimony that AppleCare was the issuer of, and obligor under, the Plans, and that AppleCare paid Apple Inc. a commission

of 15 percent to 20 percent, plus an administrative service fee, for each sale of a Plan. (Ptfs' 3rd Decl of Berwick at 2; Exs 9, 10.) Two sample service contracts support this testimony; they describe obligations of "Apple" to provide hardware service, accidental damage coverage, and technical support, and they define "Apple" as "AppleCare Service Company, Inc." The contracts describe Apple Inc. as the Plan "Administrator," which is "responsible for the collection and transfer to AppleCare Service Company, Inc. of the purchase price for the Plan and for the administration of claims under the Plan." (Ptfs' 3rd Decl of Berwick, Ex 9 at 11, Ex 10 at 7.)

Defendant has put forward nothing to refute Plaintiffs' evidence that Apple Inc. was solely an agent when its employees sold Plans to retail customers. Defendant relies on the superficial observation that Apple Inc. employees are the ones who solicited retail customers to enter into a Plan and took the customers' payment. Yet the legal consequence of Apple Inc.'s status as an agent for AppleCare is clear: the amounts paid by customers were not income to Apple Inc. But for Section 832 of the Code, discussed below, those amounts would be income only to AppleCare as the principal in the relationship with Apple Inc. *See Commissioner v. Banks*, 543 US 426, 437, 125 S Ct 826, 160 L Ed 2d 859 (2005) (concluding that entire amount of employment discrimination settlement was gross income to plaintiff, despite contingent fee arrangement between plaintiff and his or her attorney; "gain realized by [an] agent's efforts is income to the principal"); *Maryland Casualty Co. v. United States*, 251 US 342, 347, 40 S Ct 155, 64 L Ed 297 (1920) (concluding, in a case concerning the timing of inclusion of insurance premiums in insurer's gross income, that "receipt by an agent is regarded as receipt by his principal").

The court concludes that AppleCare, not Apple Inc., had gross receipts from sales of Plans to retail customers.

*Point (2): Does AppleCare's gross income exclude the amounts ceded to Apple Insurance?*

Defendant does not seriously contest Plaintiffs' legal position that the "gross income" of AppleCare, an "insurance company" for federal income tax purposes, excluded Plan premiums that AppleCare ceded to reinsurer Apple Insurance. (*See* Ptfs' Mot Part Summ J at 10.) The authority for this position is plainly stated in Section 832(b) of the Code:

"(b) In the case of an insurance company * * *

"(1) The term *'gross income' means the sum of*—

"(A) the combined gross amount earned during the taxable year, from investment income and from *underwriting income* as provided in this subsection, computed on the basis of the underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners, * * * * *

(3) The term *'underwriting income' means the premiums earned on insurance contracts during the taxable year* less losses incurred and expenses incurred. * * *

(4) The term *'premiums earned on insurance contracts during the taxable year' means* an amount computed as follows:

(A) From the amount of gross premiums written on insurance contracts during the taxable year, *deduct* return premiums and *premiums paid for reinsurance*."

(Emphases added.) As explained in a 1977 Revenue Ruling published by the Internal Revenue Service: "Reinsurance premiums reduce gross premiums written * * *." Rev Rul 77-453, 1977-2 CB 236. Thus, rather than treating an insurer's payments to a reinsurer as an expense that is deductible *after* gross income has been determined, the Code treats them as never having been a part of the insurance company's gross income in the first place. *Cf. generally* Bittker & Lokken, 1 *Federal Taxation of Income, Estates and Gifts*, ¶ 2.1 (discussing common "exclusions" from gross income, such as gifts, life insurance proceeds, scholarships, and the interest on state and municipal bonds).

/ / /

It is equally clear that federal law requires the ceded premiums to be *included* in the gross income of Apple Insurance. *See* Rev Rul 77-453 ("Likewise, the reinsurer will include in gross premiums written for purposes of section 832(b)(4) the amount of the reinsurance premium that it has a fixed right to receive under the reinsurance treaty when the amount is reasonably ascertainable."). Plaintiffs acknowledge as much, and Defendant does not contest the point. (*See* Ptfs' Mot Part Summ J at 10.)

Furthermore, there is no doubt that an insurance company's exclusion from gross income of premiums ceded, together with the inclusion of those same ceded amounts in the gross income of the reinsurer, constitutes an accounting method for income tax purposes. The IRS has so ruled. *See* Rev Rul 77-453 ("The method of reporting 'premiums paid for reinsurance' is a method of accounting and any change in a taxpayer's present method of accounting for such amounts is a change in method of accounting to which the provisions of section 446 and 481 of the Code and the applicable regulations thereunder apply.").[14]

As discussed above, Defendant does not contest Plaintiffs' factual conclusion that insurance company AppleCare entered into the Plans with retail customers. Nor does Defendant refute Plaintiffs' evidence that Apple Insurance reinsured 95 percent of the risk. Plaintiffs submitted a copy of a "Contractual Liability Insurance Policy," between AppleCare as "Named Insured" and "Apple Insurance," providing for "insurance Coverage" of "95% of the Total Net Repair costs paid by [AppleCare]" for each annual period beginning July 1, 2008. (Ptfs' 1st Decl of Berwick, Ex 2 at 1.) Audited financial statements of AppleCare and Apple Insurance, as well

---

[14] The court notes that AppleCare's exclusion of ceded premiums from gross income appears also to conform to accounting principles, not just income tax requirements. Plaintiffs provided unrefuted evidence that, "[p]ursuant to U.S. generally accepted accounting principles ('GAAP'), ceded premiums are excluded from the primary insurer's revenue and included in the reinsurer's revenue. This is reflected in AppleCare Service Company's and Apple Insurance Company's audited financial statements." (Ptfs' 1st Decl of Berwick at 3.)

as copies of copies of federal income tax returns (Form 1120-PC) further support Plaintiffs' position. (*See* Ptfs' 1st Decl of Berwick, Exs 4-8.)

The court concludes that AppleCare's gross receipts, for Oregon apportionment purposes, did not include the amount of premiums ceded to Apple Insurance.

*Point (4): Were premiums that Apple Insurance received as reinsurer from AppleCare includible in the sales factor on the consolidated Oregon returns filed by Apple Inc.?*

As the last point in their primary position, Plaintiffs argue that ORS 317.715(4)(b) requires that the gross receipts of Apple Insurance be excluded from the numerator of the consolidated Oregon return because Oregon lacks jurisdiction to subject Apple Insurance to tax. Defendant challenges this argument.

a. Parties' Primary Legal Positions

Plaintiffs base their legal argument on the second sentence in ORS 317.715(4)(b), known informally as Oregon's "*Joyce*" provision,[15] which states:

> "Those members of an affiliated group making a consolidated federal return or a consolidated state return may not be treated as one taxpayer for purposes of determining whether any member of the group is taxable in this state or any other state with respect to questions of jurisdiction to tax or the composition of the apportionment factors used to attribute income to this state under ORS 314.280 or 314.605 to 314.675."

Defendant's administrative rule interpreting this provision states:

> "(1) Each member of an affiliated group of corporations must be treated as a separate corporation for purposes of determining whether it is subject to the tax jurisdiction of Oregon. A corporation is subject to the tax jurisdiction of Oregon if

---

[15] In the early case of *Appeal of Joyce, Inc.*, the California State Board of Equalization determined that when members of a unitary group conduct business in a state, it is necessary to determine whether the state has taxing jurisdiction over each entity before determining the apportioned taxable income of the group. *In Re Appeal of Joyce, Inc.* (Nov 23, 1966), 1966 WL 1411, [1966-1976 Transfer Binder] Cal Tax Rptr (CCH), 203-525 (Cal Bd of Equal). *See also* Jerome R. Hellerstein & Walter Hellerstein, 3 *State Taxation* ¶ 9.18[1][h] ("In *Appeal of Joyce* the California State Board of Equalization (SBE) held that receipts from sales of goods shipped to California customers by a seller that was part of a unitary business conducted in a state, but was not itself taxable in the state because of Public Law 86-272, may not be included in the California sales factor.").

it is 'doing business' in Oregon as defined under ORS 317.010(4) or has income from Oregon sources taxable under ORS 318.020.

"(2) In applying the apportionment provisions of ORS 314.280 or 314.605 to 314.670, each corporation subject to the tax jurisdiction of Oregon must be considered separately.

"Example: Corporations A, B and C are members of the same unitary group and file a consolidated federal return. Corporation C is 'doing business' in Oregon as defined under ORS 317.010(4) while Corporations A and B have no activities in Oregon. Since Corporation C is the only member of the affiliated group subject to the tax jurisdiction of Oregon, the Oregon property, payroll and sales included in the numerator of the apportionment formula are determined by applying the provisions of ORS 314.605 to 314.670 to the business activities of Corporation C. The denominator of the apportionment formula will include the total property, payroll and sales for Corporations A, B and C as determined by applying the provisions of ORS 314.655 to ORS 314.670. See OAR 150-314.665(6) and 150-314.665(6)(a) for an explanation regarding how ORS 317.715(3) and this rule work with the 'primary business activity' provisions of ORS 314.665(6).

"(3) The property, payroll, sales and other factors included in the apportionment formula of a consolidated Oregon return must be computed by eliminating transactions between members of the affiliated group filing the consolidated Oregon return. See OAR 150-314.650(9) regarding transactions between members of an affiliated group filing a consolidated Oregon return and related pass-through entities such as partnerships and S corporations owned by other members of that affiliated group."

OAR 150-317.715(3)(b) (2013) (renumbered in 2014 as OAR 150-317-0630).

In Plaintiffs' view, Apple Insurance is squarely in the position of Corporations A and B discussed in the example above: Apple Insurance is not doing business in Oregon; therefore, even if Apple Insurance otherwise were permitted or required to join in Plaintiffs' consolidated Oregon return, the "sales" of Apple Insurance could not be included in the numerator of the apportionment percentage on the consolidated return. (Ptfs' Mot Part Summ J at 11, 14; Ptfs' Resp at 8; Ptfs' Surreply at 7, 15; Ptfs' Supp Br Re *Alaska Airlines* at 2-3.)

The essence of Defendant's primary legal argument is set forth in Defendant's opening brief:

"The language in ORS 317.715(3)(b) must also be harmonized with ORS 317.710(5)(c):

> '(c) Whenever two or more corporations are required to file a consolidated state return under paragraph (a) of this subsection, any reference in this chapter to a corporation for purposes of deriving Oregon taxable income shall be treated as a reference to all corporations that are included in the consolidated state return.'

"In other words, a business such as Apple may not evade Oregon tax by 'siloing' its business operations amongst subsidiaries as if they are separate businesses, to exclude their gross receipts from the Oregon sales factor numerator. This is not to say that if, for example, Apple sold extended warranty service contracts to purchasers only outside of Oregon, the receipts from such contracts would still be included in the Oregon sales factor numerator--ORS 317.715(3)(b) prohibits that."

(Def's Cross-Mot Part Summ J at 7-8.)

Defendant correctly states that the two statutes must be "harmonized." *See* ORS 174.010 ("where there are several [statutory] provisions * * * such construction is, if possible, to be adopted as will give effect to all."). Reading them together, however, the court concludes that ORS 317.710(5)(c) simply states the general rule, and ORS 317.715(4)(b) states exceptions. The general rule is that two or more affiliated corporations joining in a consolidated Oregon return are treated as one corporation for purposes of deriving Oregon taxable income. Their Oregon taxable income is based on consolidated federal taxable income, which generally is "computed by aggregating the income and deductions of each member of the group." Hennessey, *The Consolidated Tax Return* at ¶ 16.01. As part of this process at the federal level, intercompany dividends are eliminated and adjustments are made for intercompany gains and losses. *See id.* at ¶ 11.01 (checklist of steps). Likewise, at the state level, the sales or other apportionment factors of the affiliates are aggregated, with intercompany transactions eliminated from the sales factor. *See* OAR 150-317.715(3)(b) (renumbered in 2014 as OAR 150-317-0630) ("The property, payroll, sales and other factors included in the apportionment formula of a consolidated Oregon

return must be computed by eliminating transactions between members of the affiliated group filing the consolidated Oregon return.").  Under the exceptions in ORS 317.715(4)(b), as confirmed by Defendant's rule, affiliates are *not* treated as one taxpayer, even if they join in a single consolidated federal return, for purposes of determining whether any one affiliate is subject to Oregon's taxing jurisdiction, and the sales of any affiliate that is *not* subject to Oregon's taxing jurisdiction are not included in the numerator of the apportionment percentage shown on the consolidated Oregon return.

The court finds Defendant's reference to the general rule in ORS 317.710(5)(c) unhelpful, as the issue in the case is whether an exception applies under ORS 317.715(4)(b). Defendant's own administrative rule confirms the existence of the exception for an affiliate not subject to Oregon's taxing jurisdiction.  Plaintiffs rely on that exception, and Defendant does not disavow it.

The remainder of Defendant's argument refers to "Apple" without defining whether it means Apple Inc., AppleCare, Apple Insurance, or any combination of them.  Applying the complex statutes governing affiliated corporations, consolidated federal returns, consolidated state returns, and jurisdiction to tax requires a high level of precision.  Without it, Defendant's argument becomes a vague accusation of "evasion" that does not assist the court.

The court concludes that Plaintiffs' primary position is correct on the law:  assuming that Oregon lacks jurisdiction to tax Apple Insurance, the 95 percent of Plan premiums ceded by AppleCare to Apple Insurance cannot be counted in the numerator on the consolidated Oregon return filed by Apple Inc.

/ / /

/ / /

b.    Parties' Factual Positions

The court now turns to Plaintiffs' factual position, that Apple Insurance lacks sufficient contacts with, and activity in, Oregon to be subject to Oregon's taxing jurisdiction. Plaintiffs rely on an employee declaration that states:

> "Apple Insurance Company is an Arizona insurance company, domiciled in Arizona. It is not an admitted insurer in Oregon. It does not do business in Oregon and does not have any Oregon activity or nexus with Oregon."

(Ptfs' 1st Decl of Berwick at 3.) The declaration goes on to explain:

> "Apple Insurance Company was created, and the reinsurance of AppleCare service plans was undertaken, for business reasons, based on the nature of insurance regulation. Insurance is generally regulated at the state rather than the federal level. Each state may impose its own requirements for an insurance company to operate and sell insurance in the state. The process of applying and obtaining admission to operate as an insurance company in all 50 states would be a very lengthy and time-consuming process. The reinsurance structure required that Apple Insurance Company be admitted as an insurance company only in one state, while placing 95% of the risk and liability under the extended service plans in the insurance company."

(*Id.* at 5.) In a later declaration, the same employee describes transactions involved in the sale of Plans and the provision of services pursuant to the Plans:

> "10.    AppleCare Service Company paid Apple Inc. a commission for each AppleCare service plan sold through Apple Inc. The commission was 20% for AppleCare service plans for Mac computers and 15% for Apple devices that used the iOS operating systems, such as iPhones, and iPads.
>
> "11.    Apple Inc. charged AppleCare Service Company an administrative service fee of $4.25 for each repair undertaken on behalf of AppleCare Service Company under an AppleCare service plan. This fee was in addition to the charges for labor and materials. Apple Inc. also charged AppleCare Service Company an administrative service fee of $0.59 for each sale of an AppleCare service plan made through an Apple Inc. sales channel."

(Ptfs' 3rd Decl of Berwick at 2.)

The court finds the statement that Apple Insurance "does not do business in Oregon and does not have any Oregon activity or nexus with Oregon" conclusory and merely repetitive of key statutory phrases. *Cf.* ORS 317.070 ("Every * * * business corporation * * * shall annually

pay to this state, for the privilege of *carrying on or doing business* * * * an excise tax * * *.")

(Emphasis added); ORS 317.010(4) (defining "doing business" as "any transaction or

transactions in the course of its *activities conducted within the state* * * *."). However, the

evidence that Apple Insurance was not "admitted" as an insurer in Oregon, and that the process

of admitting it would be lengthy and time-consuming, is clearly factual and presents a motivation

on the part of Apple Insurance to avoid specific actions that could subject it to Oregon's

jurisdiction to regulate and tax insurers. The evidence that AppleCare paid Apple Inc.

commissions, a service fee, and labor and materials charges for the repair of devices provides a

plausible explanation of Apple Inc.'s role that would not have required participation by Apple

Insurance. Taken together, the court finds the evidence sufficient to establish that Plaintiffs

would be "entitled to prevail" if the court were to conclude that Defendant has failed to show

that there is a genuine issue of material fact. Tax Court Rule (TCR) 47 C.

In response, Defendant points to no evidence constituting "specific facts showing that

there is a genuine issue as to any material fact for trial." TCR 47 D. Defendant does *allege* that

"Apple Inc. and AppleCare are * * * agents of Apple Insurance," and that this agency

relationship subjected Apple Insurance to Oregon's taxing jurisdiction, apparently in the manner

that an in-state salesperson might subject her out-of-state employer to tax. *See, e.g.,*

*Northwestern Cement Co. v. Minn.*, 358 US 450, 454-55, 79 S Ct 357, 3 L Ed 2d 421 (1959)

(presence of in-state sales employees, among other factors, allowed state to tax net income of

out-of-state corporation). (Def's Reply at 1.) Because Defendant's allegation appears, at least

initially, to be primarily factual in nature, the court considers it further here.

/ / /

/ / /

### i. Relationship between AppleCare and Apple Insurance

Defendant's allegation that *AppleCare* was an agent of Apple Insurance appears actually to be a legal conclusion, rather than a factual position, that Defendant draws from the 1977 IRS revenue ruling discussed above. Rev Rul 77-453, 1977-2 CB 236. A paragraph of the ruling describes the insurer as "an agent, with respect to the risks reinsured, of the reinsurer." *Id*. The paragraph explains why the insurer, "[a]s agent," must exclude from its gross premiums the premiums ceded to the reinsurer.[16] To test Defendant's allegation, the court examines the *Colonial Surety* case on which the IRS's ruling relies.

In *Colonial Surety*, the plaintiff was an insurance company that insured against damage to automobiles. The plaintiff insurer reinsured 90 percent of its risk with a reinsurer, North America, and the plaintiff agreed to cede 90 percent of the premiums to North America. North America "agreed to pay plaintiff a commission of 30 percent of the net premiums ceded to it * * *." 178 F Supp at 601. The plaintiff originally reported the full commissions that it *actually* received during the year. The tax issue arose when the plaintiff, responding to a regulatory action, sought to shift to a prospective approach by claiming a deduction for the *estimated*

---

[16] The paragraph states in full:

> "The United States Court of Claims in *Colonial Surety Company v. United States*, 178 F. Supp. 600, 602 (Ct. Cl. 1959), viewed the reinsured company as an agent, with respect to the risks reinsured, of the reinsurer. As agent, the reinsured could not earn any premiums with regard to such insurance contracts during the taxable year once the risks it had assumed as insurer were shifted to another company. Thus, the reinsured should reduce gross premiums written by premiums paid for reinsurance when the risks under the reinsured contracts have shifted as determined under the reinsurance treaty and the amount of the reinsurance premium is reasonably ascertainable. Likewise, the reinsurer will include in gross premiums written for purposes of section 832(b)(4) the amount of the reinsurance premium that it has a fixed right to receive under the reinsurance treaty when the amount is reasonably ascertainable."

Rev Rul 77-453, 1977-2 CB 236. The specific issue addressed in the ruling is the timing of recognition of income, specifically, at what point or points during the year the hypothetical insurer (a calendar-year taxpayer) should recognize the required reduction in its own earned gross premiums to account for premiums that became payable to its reinsurer each June 1.

amount of commissions that it might be required to refund to North America. The plaintiff

apparently took the position that this deduction for a "reserve for unearned commissions" was

proper because the commissions were measured as a percentage of the plaintiff's net premiums,

and the Code allowed an insurer to deduct a reserve for "unearned *premiums*" in order to account

for potential losses on the insurance policies themselves. *See id.* at 601-02 (citing *former* IRC §

204(b)(5), now codified as IRC § 832(b)(4). The court rejected the plaintiff's argument,

concluding that "commissions" are simply gross income subject to the same general rules

applicable to all taxpayers, and that the special deduction for an insurer's reserve for anticipated

amounts that might later prove to be "unearned" applies only to premiums, and not to

commissions. *See id.* at 601-02 (citing *former* IRC § 22 (1952), now codified as IRC § 61); *see*

*former* IRC § 204(b)(1), now codified as IRC § 832(b)(1) (defining "gross income" of an

insurance company as the sum of investment and underwriting income, gain from the disposition

of property, and "all other items constituting gross income under section 22").

In explaining why the plaintiff's payments from its reinsurer were commissions, the court

wrote the following passage, on which the 1977 revenue ruling relies:

> "It is common knowledge that any insurance company pays its agents
> commissions for writing insurance. Plaintiff had written the insurance which it
> re-insured with North America. *It did not write it as the agent of North America*,
> but when it reinsured the business with North America, it was recognized that it
> was entitled to the usual agent's commission. Every agent of North America who
> wrote insurance for it received a commission for doing so. When plaintiff
> reinsured the business with North America it took on, *as between it and North
> America*, the *character* of agent, and as such it was entitled to a commission on
> the amount reinsured with North America."

*Id.* at 602 (emphases added). The emphasized text makes clear that the court did *not* view the

plaintiff insurer, when issuing a contract to its customer, as acting as an agent of the reinsurer

under general principles of agency law. Rather, the court *analogized* the plaintiff insurer to what

it later called "the familiar individual insurance agent, who solicits and secures the business." *Id.* at 603. The court drew this analogy to an insurance agent solely for the purpose of explaining why it rejected the plaintiff's argument that the commission payments received from the reinsurer should somehow be recharacterized as part of the underlying insurance premiums received from insured customers. *Id.*[17]

Whether a corporation is doing business in Oregon, or otherwise is subject to Oregon's taxing jurisdiction, is a highly factual inquiry, and the subject corporation's legal relationships with others, including agency relationships, may indeed be relevant to that inquiry. *See* ORS 317.010(4) (defining "doing business"); OAR 150-317.010(4) (renumbered in 2014 as OAR 150-317-0030) (providing examples, including those involving employees or other agents, of "doing business"). However, this court sees no basis, under *Colonial Surety* or Revenue Ruling 77-453, to treat AppleCare as an agent of Apple Insurance for any purpose other than to accurately apply, *by analogy*, the specific accounting method for "gross premiums" prescribed in IRC § 832(b)(4). While the court is bound by Oregon statute to apply that accounting method to determine a corporation's "gross receipts" for apportionment purposes, the court is aware of no authority that permits or requires it to apply that accounting method, or to use the federal agency analogy, to decide whether a corporation is "doing business" in Oregon for purposes of ORS 317.070. The court rejects Defendant's theory that Apple Insurance became subject to

---

[17] In a later advisory memorandum, the IRS, too, characterized the court's references in *Colonial Surety* to an agency relationship between an insurer and its reinsurer as an analogy. *See* General Counsel Memorandum 38833 (Apr 6, 1982) ("as pointed out by the court in *Colonial Surety Company v. United States*, 178 F. Supp. 600, 602 (Ct. Cl. 1959), ceding commissions are to reinsurers *as* agents' commissions are to primary insurers; in effect, the primary insurer acts *in lieu of* an agent for the reinsurer) (emphasis added); *id.* (citing other IRS administrative pronouncements "in which we relied on the *analogy* between ceding commissions and agents' commissions as the basis for concluding that any reimbursements payable to the reinsureds are deductible by the reinsurer") (emphasis added).

Oregon's taxing jurisdiction because its contract to reinsure AppleCare's Plans amounted to hiring AppleCare as an in-state agent. Defendant has put forward no evidence of any other agency relationship between Apple Insurance and AppleCare. Therefore, the court will deny Defendant's cross-motion to the extent that it relies on a theory that AppleCare served as agent of Apple Insurance in Oregon.

### ii. Relationship between Apple Inc. and Apple Insurance

With respect to the relationship between Apple Inc. and Apple Insurance, Plaintiffs argue: "Apple Inc. is not an agent of Apple Insurance Company." (Ptfs' Surreply at 5.) Plaintiffs put forward evidence that it was AppleCare that paid a commission of 15 percent or 20 percent for sales of Plans, as well as service fees and labor and materials charges. (Ptfs' 3rd Decl of Berwick at 2.) In response, Defendant points to no evidence in the record that Apple Inc. served as an agent for Apple Insurance. Defendant resorts to painting a simpler picture of the facts and the law than actually exists, blurring the lines among the corporate entities and applying a broad-brush label of "unreasonable" instead of tracing through the multilayered statutory structure that the legislature has provided. (*E.g.,* Def's Reply at 4 ("It is unreasonable for corporations such as Apple [undefined] or any other seller of tangible personal property with associated extended warranties to think that ORS 317.715(3)(b) allows them to form subsidiary corporations to avoid Oregon tax on their receipts under a theory akin to separate accounting."). Therefore, the court will deny Defendant's cross-motion to the extent that it relies on a theory that Apple Insurance was subject to Oregon's taxing jurisdiction because it used Apple Inc. as an agent.

/ / /

/ / /

C.    *Plaintiffs' Argument Based on 2017 Law Changes*

At the court's request, the parties briefed the possible effect of 2017 amendments to ORS 317.715(2), which the parties ultimately have agreed apply retroactively to this case.  *See* Or Laws 2017, ch 316, §§ 2-4.  (*See* parties' October 31, 2022, letters to the court and subsequent briefing.)  The amendments add "any * * * insurer" as a category of entities whose income must be "eliminat[ed] from the federal consolidated taxable income of the affiliated group" in determining "modified federal consolidated taxable income."  Or Laws 2017, ch 316, § 3 (amending ORS 317.715(2)).  This is significant because the first sentence in subsection (3)(b) of ORS 317.715(3) provides that "only the * * * factors of those members of the affiliated group whose items of income, expense, gain or loss remain in modified federal consolidated taxable income after the eliminations required under subsection (2)" may be taken into consideration in computing the apportionment percentage on the consolidated Oregon return.

Plaintiffs argue that, regardless of whether Apple Insurance is subject to Oregon's taxing jurisdiction, the 2017 amendments and the quoted sentence in ORS 317.715(3)(b) independently require the income of Apple Insurance to be removed from the consolidated Oregon return, and the sales of Apple Insurance to be ignored in computing the apportionment percentage for the consolidated Oregon return, simply because Apple Insurance fits within the meaning of "any * * * insurer."  The court considers this interpretation of the 2017 amendments based on the statutory text and context, and legislative history.  *See Gaines*, 346 Or at 171-72.

Turning to the text, the phrase "any * * * insurer" in ORS 317.715(2) expressly refers to an insurer that is "excluded from the consolidated state return under ORS 317.710 (5) or (7)."  Each of the latter provisions refers to insurers that have "Oregon taxable income."  ORS 317.710(5)(a), (7)(a)(A).  It is, therefore, logical to infer that the legislature meant "any"

insurer to refer to one that is taxable, because an insurer not subject to Oregon's taxing jurisdiction could have no "Oregon taxable income." The relevant context includes *Costco*, which applied a similar logic in construing ORS 317.710(5)(b), concluding that the reference in that provision to a corporation "permitted or required" to use different apportionment factors can only mean a corporation "over which Oregon has jurisdiction to tax. As to other corporations, it would be completely illogical to set forth what is 'permitted or required.'" 20 OTR at 543-44. The court finds the cross-reference to sections (5)(a) and (7)(a)(A) of ORS 317.710 a strong textual indicator that the 2017 legislature did not intend its amendments to apply to insurers not subject to Oregon tax.

*Costco*, and this court's much earlier decision in *Penn Independent*, offer important context. Both decisions hold that the income of a subsidiary *not* subject to Oregon's taxing jurisdiction must be included in the taxable income shown on a consolidated Oregon return so long as the subsidiary (in both cases, as in this case, an insurer formed under the law of a state other than Oregon) is engaged in the same unitary business as the other affiliates joining in the return. *See Costco*, 20 OTR at 545-46 ("Oregon is only taking into account the income of a unitary affiliate in computing, on an apportioned basis, the tax liability of corporations over which Oregon has jurisdiction to tax."); *Penn Independent*, 15 OTR at 74 ("Even though the state does not have jurisdiction to tax such corporations, the adjustments to corporate income are made on an as-if basis in order to assure fairness.  * * * [I]ncluding the income of a nontaxable member of a unitary group does not subject that income to taxation by Oregon. It merely provides the base from which the taxable corporation's share is apportioned."). The legislature is deemed to have been aware of this case law in 2017, and Plaintiffs' position implies that the legislature decided to overturn it, surgically, in a law addressing exactly the narrow facts of those

cases.  While the legislature was free to do so, Plaintiffs' theory has implications for the next step of the *Gaines* analysis:  if the legislature intended to change the result of case law in a highly specific set of circumstances, by giving relief to Oregon-taxable non-insurer corporations engaged in a unitary business with affiliated insurers that are not doing business in Oregon, this court would expect to see some evidence of that intention in the legislative history.

The legislative history suggests the opposite of Plaintiffs' position.  The court finds nothing about reducing the tax burden on non-insurers that are subject to Oregon tax by changing the rule of *Penn Independent* and *Costco* to subtract the income of nontaxable insurance affiliates.  In fact, the Legislative Revenue Office concluded that the bill that enacted the amendments would have "Minimal Revenue Impact," suggesting that the legislature did not intend to change the *status quo ante*:

https://olis.oregonlegislature.gov/liz/2017R1/Downloads/MeasureAnalysisDocument/37734.]

Also telling is that Defendant, which had advocated for the result in *Penn Independent* and *Costco*, apparently "agreed" to the bill as a set of "consensus amendments."  *See* Explanation of Proposed Amendments to SB 153:

https://olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/129453]

The legislative history supports the court's reading of the plain text and does not support Plaintiffs' position.

/ / /

/ / /

/ / /

ORDER GRANTING PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT   TC 5416

The court rejects Plaintiffs' argument and concludes that the 2017 amendments do not change the court's analysis or conclusions above.[18] The court expresses its appreciation to the parties for their supplemental briefing on this point.

D.    *Other Issues*

1. *Does ORS 314.295 allow Defendant to recompute the "gross receipts" on the consolidated return?*

In a footnote in its opening brief, Defendant makes the following alternative argument:

"To the extent that Apple is attempting to remove gross receipts (which they argue are synonymous with income) derived from Oregon purchasers of extended warranty service contracts from the Oregon sales factor numerator by claiming that the receipts are income of the Apple Insurance subsidiary business and not Apple's business, defendant invokes ORS 314.295 to 'redistribute' that income because it has determined 'that such [re]distribution * * * is necessary in order to prevent evasion of taxes or clearly to reflect the income of [the Apple] organization.' *See, e.g., Pacificare Health Systems, Inc. v. Dept. of Revenue*, 19 OTR 460 (2008) (court upheld the department's adjustments to reflect the economic substance of the transaction and prevent evasion of tax where taxpayer controlled its Insurance subsidiaries). We know Apple's extended warranty service contracts were purchased by Oregon purchasers, and failure to include those receipts in the sales factor evades taxes."

(Def's Cross-Mot Part Summ J at 8 n 4.)

ORS 314.295 provides:

"In any case of two or more organizations, trades or businesses (whether or not incorporated, whether or not organized in the United States and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Department of Revenue may distribute, apportion or allocate gross income, deductions, credits or allowances between or among such organizations, trades or

---

[18] The 2017 amendments are, however, relevant to Defendant's overall position. Defendant seems to acknowledge that, if Apple Insurance *was* subject to Oregon's taxing jurisdiction, Apple Insurance would have been required to file its own, separate return, reporting its income and apportionment factor under the special provisions applicable to insurers. *See* ORS 317.650 to 317.667 (imposing tax on insurers, on income as measured for regulatory purposes and applying special "insurance sales" factor); ORS 317.710(7)(a)(C) (as amended by Or Laws 2017, ch 316, § 2) (excluding taxable insurer from consolidated Oregon return); ORS 317.715(3)(b) (as amended by Or Laws 2017, ch 316, § 3 (excluding sales of taxable insurer from numerator of sales factor on consolidated Oregon return)). Defendant does not argue that the income and sales of Apple Insurance would be includible on the consolidated Oregon return *if, in addition,* Apple Insurance filed its own separate return and paid the resulting tax. (*See* Def's Ltr, Nov 21, 2022.)

businesses, if it determines that such distribution, apportionment or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades or businesses."

This court has described ORS 314.295 as "modeled on IRC section 482" and its reach as "coterminous or overlapping with doctrines related to ownership of property, assignment of income, and substance over form." *PacifiCare Health Systems, Inc. v. Dept. of Rev.*, 19 OTR 460, 467 (2008). Defendant may apply the statute and doctrines to perform its "duty * * * to seek to distinguish tax evasion from tax avoidance," so as to ensure that the state obtains the income taxes that the legislature intended. *Moser v. Dept. of Rev.*, 4 OTR 256, 264 (1970).

Invoking ORS 314.295 and alleging evasion are serious steps, but Defendant has not treated them as such. After the footnote reprinted above, Defendant has not bothered to return to the issues in its reply brief. On the merits, Plaintiffs respond that the only evidence in the record indicates that Apple Insurance was formed because insurance regulation is a matter of state concern, and "obtaining admission to operate * * * an insurance company in all 50 states would be a very lengthy and time-consuming process." (Ptfs' 1st Decl of Berwick at 5.) Forming a single insurance company, admitted in only one state, to reinsure 95 percent of the risk and liability of Plans avoided that process. (*See id*; Ptfs' Resp to Def's Cross-Mot Part Summ J at 14-18.) Defendant does not contest that this regulatory reason constitutes a valid, non-tax business purpose, and the court finds that it does. *See Moline Properties v. Comm'r*, 319 US 436, 438-39, 63 S Ct 1132, 87 L Ed 1499 (1943) ("Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity."); *see generally* Boris I. Bittker and James S.

Eustice, 1 *Federal Income Taxation of Corporations and Shareholders* ¶ 1.05 (summarizing theories and tests, including under judicial doctrines and IRC § 482, to disregard the existence of corporations, reallocate income, or recharacterize transactions for federal income tax purposes).

Plaintiffs argue further that there is ample evidence that the relationship among Apple Insurance, AppleCare, and Apple Inc. has economic substance and that the three companies have acted consistently with it. (*See* Ptfs' Resp to Def's Cross-Mot Part Summ J at 14-18.) Plaintiffs put forward evidence that Apple Insurance was required to comply with capital and reserve requirements in Arizona, where it was formed and domiciled, and that it paid claims to AppleCare in accordance with its contractual obligations. (Ptfs' 1st Decl of Berwick, Ex 2; Ex 5 at 4-5). There is evidence that AppleCare paid Apple Inc. substantial commissions to sell the Plans, as well as fees to perform repairs. (Ptfs' 3rd Decl of Berwick at 2.) Defendant offers nothing to refute Plaintiffs' evidence.

The court rejects Defendant's argument that ORS 314.295 applies. To the extent that any of Defendant's filings can be read to include that argument in its cross-motion, the court will deny the cross-motion.

> 2. *Has Defendant shown that gross receipts of Apple Insurance would be sourced to Oregon, if Oregon's Joyce provision required them to be included in the sales factor on the consolidated Oregon return?*

Plaintiffs argue that Defendant's cross-motion must fail because, even if the gross receipts of Apple Insurance generally were includible in the sales factor on the consolidated Oregon return under Oregon's *Joyce* provision, Defendant points to no facts that show Apple Insurance's gross receipts were "in this state," and thus includible in the numerator of the sales factor, under the "sourcing" provisions of Oregon apportionment law. (Ptfs' Resp at 18-19; Ptfs'

Surreply at 3, 18-19.)[19]  Defendant does not seriously dispute that sales of the Plans were "[s]ales, other than sales of tangible personal property" under ORS 314.665(4).[20]  For such sales to be in Oregon, and thus added to the numerator of the apportionment percentage, it is necessary that at least "a greater proportion of the income-producing activity [be] performed in this state than in any other state, based on costs of performance."  ORS 314.665(4).  Defendant's briefing and argument are devoid of any theory, much less any facts, to support a conclusion that any income-producing activities associated with reinsurance occurred in Oregon, or that any costs of performing those activities occurred in Oregon.  This is a major, independently fatal omission on Defendant's part.  For this reason, even if the court otherwise were inclined to grant Defendant's cross-motion, the court could not "find that the numerator of Apple's sales factor must include all gross receipts from Oregon purchasers of extended warranty service contracts."  (Def's Cross-Mot Part Summ J at 10.)

## V.  PROCEDURAL MOTIONS

During briefing, Plaintiffs moved to strike Defendant's first attorney declaration, including the exhibits attached thereto, and parts of Defendant's cross-motion that referred to them.  (*See* Ptfs' Mot Strike (Feb 17, 2022); Decl of Harbur (Feb 4, 2022).)  First, Plaintiffs

---

[19] In order to add sales to the numerator of the apportionment percentage, the sales must be "in this state." *See* ORS 314.665(1) ("[T]he sales factor is a fraction, the numerator of which is the total sales of the taxpayer *in this state* during the tax period[.]") (emphasis added); OAR 150-317.715(4)(b) (renumbered in 2014 as OAR 150-317-0360) (providing example in which only the sales of an affiliated group member doing business in Oregon are included in numerator of the apportionment formula).

[20] Defendant makes only a vague statement, without reference to evidence or any legal authority or theory, that "[t]echnically, there would be no purchase of an extended warranty service contract without the purchase of an iPhone, iPad, iPod or Mac computer so it was the hardware purchase that generated the receipts." (Def's Reply at 5.)  Even assuming that Defendant's unsupported assertion is factually accurate as far as it goes, it merely amounts to a but-for statement; there is no evidence that the purchaser of a device must also purchase a Plan.  In any event, Defendant's statement offers no legal theory to overcome the statutory requirement to source Plans based on costs of performance.

object that the declaration and attached Exhibit A relate to allegations in Defendant's cross-motions that Plaintiffs failed to produce certain documents. Plaintiffs argue that the court should ignore the allegations and decline to admit the proffered evidence because Defendant never sought an order compelling the production it now complains about in briefing. (*See* Ptfs' Mot Strike Decl and Portions of Def's Cross-Mot Part Summ J at 1-6.) Defendant's response acknowledges not having moved to compel production. (*See* Def's Obj Mot Strike at 4.) Second, Plaintiffs object that the cross-motion, declaration, and attached Exhibit B refer to sample Plans that were in effect more than two years after the year at issue in this case, and that the sample Plans have not otherwise been shown to be relevant. (*See* Ptfs' Mot Strike Decl and Portions of Def's Cross-Mot Part Summ J at 10-11.) Defendant's response acknowledges that counsel obtained the sample Plans from the internet, using the "Wayback Machine," and that they bear dates in 2017. (*See* Def's Obj Mot Strike at 2.) The court will grant Plaintiffs' motion to the extent of holding that the First Harbur Declaration, including exhibits, is not admitted as evidence, and the portions of Defendant's cross-motion cited in Plaintiffs' Motion to Strike are therefore irrelevant.

Plaintiffs also moved to strike Defendant's third attorney declaration. (*See* Ptfs' Surreply at 16; Def's 3rd Decl of Harbur.) That declaration (1) attaches a copy of a September 29, 2021, discovery response letter from Plaintiffs and (2) states: "I have personally purchased an extended warranty service contract for an iPhone in an AT&T store at the time of purchase of the iPhone, so I know that such purchases have been made in Oregon relevant to the tax year at issue." As to point (1), Defendant cites the declaration regarding the parties' same discovery dispute discussed above, which Defendant admittedly did not bring before the court in a motion to compel. As to the second point, the court agrees with Plaintiffs that the personal, one-time

experience of Defendant's counsel at an unspecified time and location in no way assists the court in resolving the parties' cross-motions. The court will grant Plaintiffs' motion to the extent of holding that the Third Harbur Declaration, including the exhibits, is not admitted as evidence, and the portions of Defendant's briefing relying on them are irrelevant.

Finally, Plaintiffs moved to strike a reply filed by Defendant relating to the effect of 2017 amendments to ORS 317.715(2). (*See* Ptfs' Mot Strike Def's Reply Re SB 153 (2017).) Because the court rejects on the merits Plaintiffs' argument on the 2017 amendments, regardless of any reply by Defendant, the court will deny Plaintiffs' motion as moot.

## VI. CONCLUSIONS

Pursuant to the court's reasoning above, now, therefore,

IT IS ORDERED that Plaintiffs' Motion for Partial Summary Judgment is granted; and

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Partial Summary Judgment is denied; and

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike Declaration of Marilyn J. Harbur and Portions of Defendant's Cross-Motion for Partial Summary Judgment is granted; and

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike Defendant's "Reply" to Plaintiffs' Response to Court's Questions Re SB 153 (2017) is denied as moot.

Dated this 24th day of January, 2024.

1/24/2024 3:38:45 PM

**Judge Robert T. Manicke**